LOBRANO, Judge.
Plaintiff-appellant, Mozelle C. Gust, brought suit against Dr. Stephen F. Brint and his insuror, the Insurance Corporation of America, alleging medical malpractice and lack of informed consent to surgery.
Following trial on the merits, the trial judge found that Dr. Brint’s care and treatment of Gust fell below the standards applicable to his practice in failing to conduct a reasonable inquiry into Gust’s medical status before performing surgery. However, the trial judge held that while Brint’s conduct constituted malpractice, it was not a “cause-in-fact” of Gust’s injuries. We disagree.
FACTS:
Mozelle Gust first sought medical care from Dr. Stephen F. Brint, an ophthalmologist, on March 24, 1982. She was fifty-six years old at the time and had a fifteen year history of thyroid disease. Her complaints consisted of excessive tearing, sensitivity to light, difficulty while reading and large bags under her eyes that periodically filled with fluid. Following his initial examination, Dr. Brint recommended removal of the bags. He explained to Gust that her appearance would be greatly improved. He told Gust that the surgical procedure, known as a blepharoplasty,[1] was a simple *1013 matter of “snipping the bags right off”. Gust informed Dr. Brint that she could not afford such surgery. Dr. Brint assured her that her insurance would cover the surgery if it was a medical necessity. In accordance with this assurance, Dr. Brint sent a letter to Gust’s insurer explaining the surgery was necessary to remove the bags because they were pushing her glasses out of focus. Following receipt of Dr. Brint’s letter, Gust’s insurer agreed to pay for the blepharoplasty. Dr. Brint did not perform any pre-surgical tests to determine Gust’s medical status. He relied solely on her telling him that her thyroid condition was stable and that she had been cleared for surgery by her treating physician.
The surgery was performed on September 16, 1982. Prior to surgery, Gust was given a standardized consent form by the hospital staff. Dr. Brint did not explain the form nor did he inform Gust of any special risks that might be involved because of her history of thyroid disease.
The surgery took several hours longer than Dr. Brint said it would take. Following surgery, Gust remained bandaged for twenty-four hours and bled continuously through the bandages. The original sutures remained for ten days. Additional sutures were placed in the incisions for one week as Dr. Brint was not satisfied after the original sutures were removed.
Approximately one month following surgery, Gust began to experience a “scratchy” sensation in her eyes upon awakening. She felt as if she had sand in her eyes. This condition worsened. She returned to Dr. Brint for relief. Dr. Brint was unable to determine the cause. He prescribed various medications including drops and salves.
Gust’s condition worsened. She frequently sought relief from Dr. Brint often without an appointment. She had pain, excessive tearing and redness and swelling of the eye sockets from the cheekbone to the eyebrows and from the end of the nose to the outer end of the eye.
Approximately two months after surgery, Dr. Brint diagnosed dryness of the cornea. He determined Gust must be sleeping with her eyes open and instructed her to tape her eyes shut during sleep. At approximately this same time, Gust noticed tissue “growing out” of the corner of her eye. This “growth” was diagnosed by Dr. Brint as edema of the caruncle[2] tissue which continued to worsen. In addition, her lower lids displayed a condition called ectropion.[3] Dr. Brint attributed both these manifestations as resulting from dryness of the cornea from sleeping with her eyes open.
Unable to diagnose the underlying cause of Gust’s problems, Dr. Brint referred Gust to Dr. Thomas Naugle in February of 1983. Dr. Naugle found that Gust was suffering from thyroidopathy or Graves disease.[4] The end result of the Graves disease was exophthalmos.[5] Since Gust did not have sufficient lid tissue to cover her eyeball, she developed lagophthalmos.[6] Dr. Naugle changed her medications and recommended that she massage her lids.
Gust remained under the care of Dr. Brint for an additional ten months. Eventually, Dr. Brint referred her back to Dr. Naugle explaining that he was unable to do more for her and that she needed to be in the hands of a specialist.
Dr. Naugle, in order to remedy the lago-phthalmos, proposed a surgical procedure called an orbital decompression.[7] Gust’s *1014 husband, fearing more complications, refused to allow the surgery threatening to remove her from his medical insurance. As a result of the pain, discomfort and inability to function, Gust attempted suicide. Fortunately, this attempt failed. She was found by her daughter and rushed to the hospital.
The decompression was finally performed on December 15, 1983 and took seven and one-half hours. Gust suffered considerable pain and lost an excessive amount of blood requiring several transfusions.
Despite this initial decompression, Gust's lagophthalmos persisted. To attempt to remedy the problem, Dr. Naugle proposed additional surgery consisting of rescission of the eyelid retractors with insertions or scleral grafts[8] to lengthen the eyelids. This scleral graft surgery was performed on April 19, 1984 on both upper and lower lids. The upper graft was successful, the lower graft was not. Following this surgery, scar tissue formed on the lower lids creating a wart-like effect.
Dr. Naugle referred Gust to Drs. Randolph Howes, a plastic surgeon and Richard Rubin, an ophthalmologist for further consultation. Both Dr. Howes and Dr. Rubin agreed Gust needed additional surgery to relieve the pressure on the optic nerves or blindness would result.
Due to the high cost of the surgeries, the Lion’s Club intervened and placed Gust in the hands of the L.S.U. Eye Research Center. There she was treated by Dr. Darrell Wolfley.
On January 7, 1985, Gust underwent a second decompression without success. The lagophthalmos remained.
Dr. Wolfley performed a total of four skin grafts, one on each lid to remedy the lagophthalmos. Each surgery took two to four hours and each was performed separately with time in between for healing. It was only after these skin graft surgeries that Gust was able to fully close her eyes since undergoing Dr. Brint’s blepharo-plasty.
Gust appeals the verdict of the trial court asserting the following assignments of error:
1) The trial court erred in not holding that Dr. Brint’s performance of the ble-pharoplasty breached the duty of care owed to Mrs. Gust;
2) The trial court erred in not holding that Dr. Brint’s failure to warn Mrs. Gust of the risks associated with the blepharoplasty vitiated her consent; and
3) The trial court erred in not holding Dr. Brint’s substandard conduct the “cause” of Mrs. Gust’s injuries.
The testimony adduced at trial is as follows:
MOZELLE C. GUST:
Mozelle Gust testified she first sought treatment from Dr. Brint on March 24, 1982. She was suffering from sensitivity to light, excessive tearing, difficulty with her vision, swelling of the lids, redness of the eyes and surrounding socket and large bags under her eyes which periodically filled with fluid.
She told Dr. Brint that she had a fifteen year history of thyroid problems and had undergone a partial thyroidectomy wherein all, except for several small pieces of the thyroid gland, were removed. In addition, she informed Dr. Brint that she was currently under the care of Dr. Edward Mi-chaels, an internist.
Gust testified that the only test performed by Dr. Brint was an eye exam. He seemed interested only in removing the bags under her eyes. He told her it would be a simple matter of “just snipping the bags right off”. She testified she explained to Dr. Brint that her insurance company would not pay for cosmetic surgery. In response, Dr. Brint stated that he would describe the surgery as a medical necessity needed to prevent the bags from pushing her glasses out of focus. That day he sent a letter to the insurance company along with photographs of the bags under her eyes. Gust testified that the bags never caused her any visual problems.
*1015 Gust stated emphatically that Dr. Brint did not relate the bags to any disease, nor did he discuss any alternatives to the surgery. She also testified that Dr. Brint never requested that she obtain a clearance from Dr. Michaels.
Gust testified that in the hospital she was given a consent form which she signed without reading. The form was not explained to her by Dr. Brint. In fact, Gust testified that Dr. Brint never explained any special risks because of her history of thyroid disease such as excessive bleeding or a longer healing process. Gust stated that Dr. Brint assured her the surgery would take only two hours whereas it took approximately five hours. Following the surgery, Gust testified she heard Dr. Brint state to one of the hospital employees that he would never perform another blepharo-plasty for $1,600.00.
Gust testified that if she had been informed of the special risks involved she would not have consented to the surgery. She stated she bled profusely and experienced a great deal of pain. She had to take three weeks off from work because of the pain, discomfort and inability to see property-
Approximately four to five weeks following surgery, Gust stated she began experiencing a scratchy sensation in her eyes which progressively worsened. To relieve this problem Dr. Brint prescribed drops and salves which Gust had to use in “gobs, day and night”. Gust testified that she continued to experience excessive tearing, red and swollen eyes and red and swollen eye sockets. She stated she constantly complained to Dr. Brint. She was told her condition would improve and to continue to use the drops and salve. When the symptoms did not improve, Dr. Brint opined that the cause was sleeping with her eyes open causing corneal dryness. She was told to continue to use the medications and to tape her lids shut when she went to sleep.
Gust estimated that she sought relief from Dr. Brint either via telephone or in person once or twice per week from the date of surgery to December, 1982. His response was always the same, go home, use cold towels, continue to use the medications and tape her eyes shut. Her symptoms persisted. She still had a bag under her right eye.
Sometime around February of 1983, she noticed what appeared to be tissue hanging out of the corner of her eye. In addition to this new manifestation, her lower lids began to roll down. Dr. Brint then instructed her to begin massaging her lids to strengthen them.
Unable to help Gust, Dr. Brint referred her to Dr. Thomas Naugle for evaluation. Gust stated Dr. Naugle informed her she didn’t have sufficient lid tissue to cover her eyeballs thus causing corneal dryness. He referred her back to Dr. Brint for further treatment. She remained under Dr. Brint’s care for an additional 10 months during which his treatments remained the same.
She stated the eye protrusion continued to worsen. Finally, Dr. Brint discharged her and referred her to Dr. Naugle. Dr. Naugle recommended Gust have decompression surgery to push the eyeballs further back into the sockets to allow full lid closure. Gust’s husband would not allow the surgery. Gust testified that she became depressed over the prospect of never obtaining relief. She attempted suicide by overdosing on sleeping pills. The attempt failed when her daughter found her and rushed her to the hospital.
Gust stated that she eventually underwent the decompression surgery which took seven and one-half hours. She testified she lost a considerable amount of blood and suffered excruciating pain. She took several months to recover. Even after this surgery, she still was not able to fully close her eyes.
She stated she later underwent additional surgery wherein Dr. Naugle performed scleral grafts to both upper and lower lids. This surgery was only partially successful. The lower lid grafts did not take and a lot of scar tissue developed. Gust still could not fully close her eyes.
Dr. Naugle referred Gust to Dr. Randolph Howes, a plastic surgeon and Dr. Richard Rubin, an ophthalmologist for fur *1016 ther evaluation. Dr. Rubin found an infection behind her eyeballs, swelling of the optical muscles with resulting pinching of the optical nerve. Both doctors agreed Gust needed immediate surgery to relieve the pressure on the optic nerve or blindness would occur.
Dr. Rubin contacted the Lion’s Club which in turn referred Gust to the L.S.U. Eye Research Center. Physicians at L.S.U. undertook another decompression surgery in January, 1985 which was not successful. Gust stated that it was eventually determined that only additional skin graft surgery would correct the problem. Four skin graft surgeries were performed by Dr. Wolfley over a five month period ending in May, 1985. It was only after completion of the surgeries that Gust was able to fully close her eyes since the blepharoplasty.[9]
LAUREN GUST WHITAKER:
Lauren Gust Whitaker, Gust’s daughter, testified that she encouraged her mother to seek medical help after she began experiencing redness and swelling of area around the eyes, extreme sensitivity to light, extreme intolerance to heat, excessive tearing, trembling of her hands and large bags under her eyes which filled with fluid resembling a “gigantic blister” “full of water”. She stated that her mother could not leave home without sunglasses and kept the air conditioning on so low that the rest of the family was unable to tolerate the temperature.
Whitaker stated emphatically that her mother’s decision to have the surgery was not because she was having difficulty wearing glasses. She stated her mother hardly ever wore glasses. The reason she decided to have the surgery was because Dr. Brint told her it would be simple and would improve her appearance.
She stated the surgery lasted much longer than Dr. Brint said it would take.
Following surgery, Gust was unable to close her eyes. Whitaker described how, on one occasion, she was talking to her mother for quite a while before realizing her mother was sleeping with her eyes not fully closed. She stated emphatically that prior to the surgery, her mother never slept with her eyes open. In addition she stated that shortly after surgery, she was able to see inside her mother’s lower lids. She described a rolling down of the lid. Also, she stated she noticed a “pink” or “whitish” or “milkish” condition in the corner of her eye which Whitaker thought was what is commonly called “sleep”.
Whitaker testified that approximately one month following the blepharoplasty, her mother complained of a scratchy feeling in her eyes as if she had sand in them.
Whitaker corroborated her mother’s depression and suicide attempt. She stated that her mother has lost her self-esteem and no longer cares about her personal appearance.
FAYE McQUILLAN:
Faye McQuillan, plaintiff’s sister, testified that prior to surgery, Gust experienced trembling, redness and swelling around her eyes, excessive tearing and sensitivity to light. McQuillan stated that Gust was so sensitive to light that she was unable to watch television or leave the house without sunglasses.
McQuillan testified that shortly after the blepharoplasty, Gust complained of redness and swelling of the lids. She noticed Gust’s lids began protruding downward “like if you had something there and rolled it down.” In addition, Gust complained of sand in her eyes and the inability to close her eyes.
McQuillan described Gust’s appearance after the surgery as much worse than before. She stated Gust’s eyes protruded so much they looked like they were going to “pop out”. Her appearance was so bad, she encouraged Gust to see another doctor.
McQuillan testified that she stayed with Gust day and night because she was unable to see or care for her daily needs.
*1017 McQuillan stated emphatically that following Dr. Brint’s surgery, Gust was unable to close her eyes. She stated she slept with her and had to tape her eye shut.
She testified her sister has changed since the surgery. She has become very reclusive and refuses to leave the house. She is unable to wear makeup and no longer cares about her personal grooming and appearance.
DR. STEPHEN M. BRINT:
Dr. Stephen M. Brint, defendant, was recognized as an expert in the field of ophthalmology.
Dr. Brint testified he first saw Gust on March 24, 1982. At that time she complained of bags under her eyes, problems with vision, possible clogged tear ducts, red, swollen eyelids, excessive tearing and sensitivity to light. He stated she related her fifteen year history of thyroid problems and that she had undergone a partial thyroidectomy. Dr. Brint testified Gust’s appearance matched her history of thyroid disease. He asked her about her medical condition. She responded that she was currently under the care of Dr. Edward Mi-chaels, her internist, and that her condition was stable. He stated that her main complaint was the bags under her eyes. He explained that the upper part of the eyelids directly under the lashes were swollen and pushing against her glasses causing blurred vision.
Dr. Brint testified he checked Gust’s visual acuity and found she needed a new prescription. He stated he dilated and probed her tear ducts and found no blockage.
Dr. Brint testified the photos he took of Gust prior to surgery did show mild exo-phthalmos but he did not note this in his records. He stated he dismissed her red and swollen eyelids and excessive tearing as related to the bags under her eyes. He did not test for any underlying disease and did not use the Scheriver tear test because he felt it was not reliable. In addition, he stated he found no explanation for her sensitivity to light and made no test to determine any underlying disease or cause.
He testified that he explained to Gust that the bags could be removed by performing a blepharoplasty. That same day he wrote a letter to her medical insuror explaining the necessity for the procedure.
Dr. Brint next saw Gust on September 15, 1982, the day before the surgery. He visually examined her. No other pre-opera-tive tests were performed.
He stated he did not inform Gust of any special complications she might experience. He told her the area around the eyes would be black and blue, that there would be swelling requiring the need for ice packs and that it was very important to not over-correct or under-correct during the surgery. He stated he explained that the surgery would be done under local anesthesia and that he would do a minimal procedure on the lower lids. He testified the surgery was limited to skin and some minor amounts of fat.
Dr. Brint testified that he did not personally consult with Dr. Michaels. He trusted that Gust gave him correct information about the stability of her condition. He stated that since blepharoplasty is not related to the onset of Graves disease, he did not consider informing her of “all the bad things” that could happen if she subsequently developed the disease.
He testified his records showed the ble-pharoplasty was “totally routine with no complications” and took approximately three and one-half hours which was not unusual.
Dr. Brint next saw Gust on September 21st and 24th, 1982 for removal of her sutures. On October 11, 1982 Gust displayed an infection of the right eye. Dr. Brint prescribed medications. In another office visit on December 1, 1982, Gust displayed excess tissue hanging out of the corner of her right eye near the caruncle. Dr. Brint noted that the bag on the left cheek was successfully corrected but the one on the right cheek remained.
Gust next saw Dr. Brint on December 15, 1982. She complained of a scratchy sensation in her eyes when she awoke. Dr. Brint felt this was due to drying of the *1018 corneas from sleeping with her eyes open. He directed her to tape her eyes shut.
He next saw Gust on January 12, 1983. He stated the scratchy sensation had improved. He continued her medications and scheduled a revision of the blepharoplasty to remove the remaining bag. In addition, he instructed Gust to return in one month to check the swelling of the caruncle.
Her next appointment was February 7, 1983. On this date, Dr. Brint testified he decided to refer Gust to Dr. Thomas Nau-gle for consultation. Dr. Brint noted in his records that Dr. Naugle felt the swelling of the caruncle was due to exposure. He also noted that Dr. Naugle recommended the bag be removed by a horizontal incision.
Dr. Brint continued to treat Gust. She continued to complain of excessive tearing and decreased vision. Her ocular pressure increased and she was prescribed medication for glaucoma.
On cross examination, Dr. Brint agreed that excessive tearing is a symptom of Graves disease. He testified that on the three visits prior to the surgery, he did find a change in Gust’s condition but determined it was “minimal”.
He admitted he did not inquire as to the specific type of thyroid problems Gust suffered. He agreed that he was aware there was a chance that Gust could develop malignant Graves disease but felt it was “minimal”.
He admitted that Gust did have lid retraction and a slight stare. He agreed that a patient with lid retraction is at an increased risk of corneal exposure. He also admitted Gust displayed edema of the lower lids. Again he felt this was insignificant.
Dr. Brint stated it was common to do a blepharoplasty on all four lids and that Gust was informed of this.
When questioned about Gust’s swollen caruncle following surgery, Dr. Brint stated he considered this of minor importance. He admitted that by January of 1983, he began to suspect Gust had active Graves disease.
He admitted he placed no significance to Gust’s initial complaints and symptoms because the eye examination proved negative. When asked why he did not perform tests to determine Gust’s sensitivity to light, Dr. Brint responded that he couldn’t recall any patient “not checking that off.”
DR. EUGENE 0. WIGGS:
Dr. Eugene 0. Wiggs was recognized as an expert in ocular plastic surgery. He testified on behalf of plaintiff.
Dr. Wiggs stated emphatically that after extensive review of Gust's medical records and the depositions and records of Drs. Brint, Howes, Naugle and Rubin, he concluded that Dr. Brint was guilty of substandard care in his treatment of Gust. He found the initial pre-surgical examination substandard and lacking in proper documentation. He testified that a thorough and extensive work-up should have been done because Gust was predisposed to a “host of complications” because of her history of thyroid disease.
Dr. Wiggs stated emphatically that given the symptoms displayed by Gust he would not have performed the blepharoplasty. He stated that the standard of care in 1982 was not to perform surgery on a patient with Gust’s symptoms. He described these as constituting a “red flag” to any ophthalmologist.
He testified that even if Gust had no outward manifestations of active thyroid disease, he would not have performed the surgery without extensive testing over a prolonged period of time to determine her medical status. He stated that from the pre-surgical photographs of Gust, it was obvious she displayed classic symptoms of active Graves disease.
Dr. Wiggs testified that the decompression surgery performed by Dr. Naugle was needed to make future lid lengthening procedures effective. He stated this type of surgery is not common for Graves patients. In addition, he testified the blepharoplasty worked against the success and effectiveness of the scleral grafts on both the upper and lower lids. This, in turn, predisposed Gust to ectropion of the lower lid. He attributed excessive skin removal during *1019 the blepharoplasty as the cause of her post operative ectropion.
Dr. Wiggs stated the biggest risk to a patient with active Graves disease who undergoes a blepharoplasty is the inability to fully close the lids — lagophthalmos. He testified that in Gust’s case, the removal of upper and lower lid tissue was very untimely. It served to compound and exacerbate the manifestation and complications associated with Graves disease and rendered any subsequent surgical procedures less effective.
Dr. Wiggs further testified that it was the standard of care in 1982 to fully inform the thyroid patient of all the problems associated with a blepharoplasty such as excessive bleeding, scarring and a prolonged healing process.
DR. RANDOLPH HOWES:
Dr. Randolph Howes, a plastic surgeon, was recognized as an expert in blepharo-plasty.
Dr. Howes testified he saw Gust on April 11, 1984 at the request of Dr. Naugle following the first decompression surgery. Dr. Naugle referred Gust for a second opinion regarding the necessity for skin grafts. At that time Gust displayed a slight exophthalmos, excessive tearing, conjunctivitis,[10] corneal dryness and ectro-pion of the lower lids. Dr. Howes determined that Gust needed additional surgery to remedy the ectropion of the lower lids.
Dr. Howes next saw Gust on August 15, 1984. At that time she displayed “scleral show”,[11] conjunctivitis, bilateral tearing and red and swollen nodules beneath the ciliary lines of the eyelashes. Dr. Howes attributed all of these manifestations to the blepharoplasty.
Dr. Howes stated that the development of ectropion within four to five weeks after the blepharoplasty raised the possibility of excessive tissue removal.
Dr. Howes testified emphatically that given Gust’s medical history he would not have performed a blepharoplasty without obtaining her medical records and personally contacting her physician. In addition, he stated he would have warned Gust of the possibility of excessive bleeding, infection, possible scarring, ectropion, dry eye syndrome and the remote possibility of blindness.
DR. ALVARO O’BYRNE:
Dr. Alvaro O’Byrne was recognized as an expert in ophthalmology. He testified on behalf of plaintiff.
Dr. O’Byrne testified that he first saw Gust on October 26, 1983 following a referral by Dr. Naugle. At that time, Gust complained of lagophthalmos. Gust told Dr. O’Byrne that a few weeks after the blepharoplasty she was unable to fully close her eyes. Dr. O’Byrne’s examination revealed that Gust suffered from a mild exophthalmos with lagophthalmos of two to three millimeters.
Dr. O’Byrne testified that the symptoms displayed by Gust prior to the blepharo-plasty were indications of active Graves disease. He stated that given her history of thyroid disease he would not have performed surgery without a complete medical work up with participation by her treating physician. All tests would have had to be normal for at least six months. He emphatically stated that given her symptoms any ophthalmologist in 1982 should have recognized substantial evidence of active Graves disease.
DR. RICHARD L. RUBIN:
Dr. Richard L. Rubin was recognized as an expert in ophthalmology. He testified on behalf of plaintiff.
Dr. Rubin first saw Gust on September 18,1984 following a referral by Dr. Howes. Gust’s complaints consisted of double and blurred vision, pain, protrusion of the eyes and the inability to fully close the eyes.
Dr. Rubin found marked exophthalmos in both eyes, marked bilateral ectropion of both lower lids and excessive tearing. He performed a Scheriver tear test and found *1020 a strong tear reflex compatible with dry eye syndrome and thyroid disease. In addition he found Gust displayed extraocular muscle abnormalities, classic lid lag,[12] thickening of the lids, loss of elasticity, conjunctival edema and double vision.
Dr. Rubin stated that the lower lid retraction was primarily a result of the shortening of external eyelid tissue.
Dr. Rubin testified that given Gust’s appearance and symptoms prior to the ble-pharoplasty, she undoubtedly had active Graves disease which continued to progress after the surgery. He stated that he would have completely evaluated her condition over a one year period before performing any surgery. More importantly, he would have measured the degree of protrusion to determine if any change had occurred.
Dr. Rubin stated that just because a patient’s thyroid is under control does not eliminate the possibility of active Graves disease. In fact, he testified this is when it should be evaluated very closely because a history of thyroid disease is a “red flag” to an ophthalmologist.
Dr. Rubin stated that the medical management and evaluation of Graves disease is the responsibility of the ophthalmologist who is going to perform the surgery, not the treating internist or endocrinologist.
Dr. Rubin stated that in no way should Dr. Brint have relied on what Gust described as her condition. He testified that in 1982, given Gust’s symptoms and medical history, Dr. Brint’s care and treatment of Gust was substandard. He testified that the presence of ectropion several months after the blepharoplasty indicated over correction. He stated the necessity for skin grafts is uncommon for Graves patients and was necessary to correct the effects of the blepharoplasty. Dr. Rubin testified that the blepharoplasty, in effect, diminished the effectiveness and hindered the success of all subsequent surgeries.
DR. DARRELL E. WOLFLEY:[13]
Dr. Darrell E. Wolfley is a professor of ophthalmology and director of ocular plastic surgery at the L.S.U. Eye Research Center.
Dr. Wolfley refused to render an opinion as to the standard of care exercised by Dr. Brint but did agree to answer questions of fact.
He testified that he performed full thickness skin grafts on Gust’s lower lids in the same area the skin had been removed during the blepharoplasty. These surgeries were necessitated by the fact that there was insufficient lid tissue. In addition he testified that he performed cartilage grafts on the posterior surface of the lower lids to lengthen them. All in all, he stated he performed a total of four surgical procedures on Gust and found extensive scar tissue throughout the entire lid surface.
DR. EDWARD L. MICHAELS:
Dr. Edward L. Michaels was recognized as an expert in internal medicine specializing in endocrinology. He testified on behalf of defendant.
Dr. Michaels stated that he first saw Gust on March 19, 1982. At that time she complained of protrusion of the eyes which he noted in his records. Prior to that date, the only notation of exophthalmos was made in 1978 when she saw Dr. Bruce Samuels. Because he had not seen Gust prior to March 19th, he had no way of documenting any change in her exophthal-mos because he had no prior measurements to compare.
He admitted that no pre-surgical tests were made other than a thyroid test which were stable except for a minimum elevation of serum phaspharus. He stated that other tests could have been made to determine if Gust had active Graves disease.
He stated unequivocally that Graves disease can be active even when the patient’s thyroid gland is stable. He stated that Gust’s pre-surgical photos did show some *1021 lid retraction but he would defer to the ophthalmologist performing the surgery to determine the presence of active Graves disease as it relates to ocular function.
DR. THOMAS C. NAUGLE, JR.:
Dr. Thomas C. Naugle, Jr. was recognized as an expert in ophthalmology and ophthalmic plastic surgery. He testified on behalf of defendant.
Dr. Naugle first saw Gust on February 27, 1983 following a referral by Dr. Brint. At that time she displayed residual bagginess of the eyelids, edema of the caruncle, excessive tearing and exophthalmos. Dr. Naugle stated he found no evidence of ectropion.
Dr. Naugle diagnosed Gust as having symptoms of active Graves disease. He stated that although Dr. Brint did not succeed in removing both bags, the blepharo-plasty was conservative and competently performed. He testified that he did not believe that Dr. Brint had removed an excessive amount of skin. Gust was referred back to Dr. Brint for continued treatment.
Dr. Naugle did not see Gust again until July 29, 1983. Her symptoms had worsened. She displayed red, irritated eyes, excessive tearing and increased exophthal-mos. Dr. Naugle concluded that Gust had active Graves disease. He recommended that she undergo decompression surgery to reduce the degree of protrusion to allow full closure of the lids. This surgery was eventually performed on December 15, 1983. Dr. Naugle stated the surgery was not successful. Gust was still not able to fully close her eyes. In another attempt to remedy the exophthalmos, Dr. Naugle performed scleral graft surgery. This surgery was only partially successful.
On cross examination, Dr. Naugle stated that at the time he first saw Gust, she displayed symptoms that should “tip off a person” that she may have active Graves disease. He stated that he would have expected Dr. Brint or any other ophthalmologist to recognize these symptoms.
Dr. Naugle stated that a patient with a stable thyroid can still have active Graves disease. He further testified that if Gust had been his patient he would not have performed surgery without following her condition over a period of time inorder to measure the degree of exophthalmos. By following her condition over a period of time, he would have been able to determine if her Graves disease was active.
Dr. Naugle testified that a blepharo-plasty on a patient who can develop Graves disease increases the necessity for later skin grafts to lengthen lid tissue. He agreed that the full thickness skin grafts performed by Dr. Wolfley were not commonly needed by Graves patients and were in the exact location where Dr. Brint had removed tissue.
Dr. Naugle testified that while the progression of Graves disease was the major source of Gust’s problems, the blepharo-plasty made the subsequent surgeries more difficult and less effective.
DR. HOWARD REITMAN:
Dr. Howard Reitman was recognized as an expert in ophthalmology. He testified on behalf of defendant.
Dr. Reitman testified that a patient with a normal functioning thyroid can still have active Graves disease. He explained that the reason for this is because Graves disease is not a disease of the thyroid gland but of the pituitary gland which produces an exophthalmos — producing hormone.
Dr. Reitman stated he found no relationship between the onset of Gust’s Graves disease or the necessity for the subsequent surgeries and the blepharoplasty. He testified that given the state of the art in 1982, Dr. Brint’s blepharoplasty was appropriate.
On cross examination, however, Dr. Reit-man testified that if Gust had been his patient in 1982, he would not have performed surgery without a personal clearance from her treating physician to assure himself that her condition was stable. He further stated that given her symptoms, Gust was at a greater risk because of the possibility of her Graves disease reactivating.
Dr. Reitman testified that blepharoplasty is not the procedure that should have been used to remove the bags from under Gust’s *1022 eyes. He stated that if Dr. Brint so advised Gust, then he misadvised her.
He further testified that Graves patients are predisposed to complications such as increased bleeding, lack of structural support for tissue, tear production and a slower healing process.
Dr. Reitman agreed that in 1982 a physician had an obligation to inform a patient of the alternatives to surgery and that they could possibly recover without surgery.
ACTION OF THE TRIAL COURT:
Trial was held from June 13th through 21st, 1989. Judgement was rendered June 30, 1989 dismissing Gust’s action. In his reasons for judgment, the trial court stated:
“I conclude Dr. Brint’s care was below the standard applicable in 1982. He failed to make reasonable inquiry into plaintiff’s thyroid disease before the operation. Such sub-standard conduct, however, was not a cause in fact of the complications that followed ...
******
The lagophthalmos developed because of a subsequent’ onset of Groves’ [sic] disease, coincidentally following but not caused by the blepharoplasty.”
Combining Gust’s assignments of error, the issue for review is whether the trial court committed manifest error in finding that Dr. Brint’s sub-standard care of Gust was not a cause of her injuries.
We are satisfied that the record supports the conclusion that Dr. Brint’s failure to perform the appropriate pre-operative tests constituted substandard care. The court erred, however, in its conclusion that the injury for which Gust sought damages was the onset of Graves disease. Clearly, Gust does not argue that Dr. Brint’s surgery caused the disease. She asserts that her compensable harm was the increased risks she sustained because of the initial surgery. That is, had Dr. Brint not been negligent in his pre-operative care, blephar-oplasty would not have been performed, and thus she would not have had the complications she subsequently experienced. Thus the correct inquiry for our determination is not whether the blepharoplasty caused the onset of Graves disease, but whether it increased the risk of harm to Gust following the onset of that disease. The trial court did not make a factual determination with respect to that inquiry, thus we are not bound by the clearly erroneous or manifest error standard of review. Our independent review of the evidence preponderates in plaintiff’s favor.
It is well settled that a tortfeasor takes his victim as he finds him and is responsible for all the natural and probable consequences of his wrong even though they (the consequences of the tort) are made more serious or harmful by reasons of a pre-existing physical defect. Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Sepulva-do v. Willis-Knighten Medical Center, 459 So.2d 152 (La.App. 2nd Cir.), writ den. 462 So.2d 197 (La.1984). This principle is reinforced by the “increased risk of harm” rule as enunciated in Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). The court in Hastings adopted section 323 of the Restatement (Second) of Torts which provides:
“One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other’s reliance upon the undertaking.” See also, [Knopfer] v. Louisiana Patients Compensation Fund, 527 So.2d 326 (La.App. 4th Cir.1988).
The evidence and testimony is overwhelming that Dr. Brint breached the standard of care owed to Gust by failing to detect the onset of Graves disease. As a consequence of this failure, he performed a blepharoplasty which should not and would not have been done had the Graves disease been properly detected and diagnosed. While the blepharoplasty did not cause the Graves disease, it clearly exacerbated its *1023 effects. The preponderance of the testimony was to the effect that the reduced lid tissue exacerbated and worsened the lago-phthalmos associated with the disease. Dr. Wiggs stated the “stage was set” for the lagophthalmos by reducing the lid tissue. This reduction in lid tissue then necessitated additional surgeries consisting of two decompressions, scleral grafts and four skin grafts to correct the negative effects of the blepharoplasty so that Gust could, once again, fully close her eyes. Besides necessitating these surgeries, the blepharo-plasty impeded their success and effectiveness.
Thus, while there is no doubt that Gust would have suffered from the complications and consequences of Graves disease, the record clearly shows these complications and consequences were exacerbated and compounded by the blepharoplasty.
DAMAGES:
DR. RICHARD RUBIN testified that Gust will need continued medical supervision for the rest of her life to avoid additional complications. He estimated the cost between $25,000.00 and $50,000.00 over the next fifteen years not including the cost of other specialists.
Josette Brew, Manager of the retirement system for employees of the City of New Orleans and Lawrence Yohn, Management Division Chief for the New Orleans Recreation Department, testified that Gust was discharged on February 14,1984 due to her illness. Her salary at that time was $763.00 per month. They testified that had Gust been able to continue working until age 62, she could have retired in 1988.[14]
Gust testified she lost fourteen weeks of work due to the blepharoplasty totalling $2,465.05 in lost wages. In addition, she testified she lost $37,285.26 in wages from the date of discharge to March 2, 1988, the date of her sixty-second birthday when she could have retired.
Gust testified her hospital bills totaled $43,199.07; her physicians bills totaled $22,992.00 and her prescription medications for 1983, 1984 and 1985 totaled $4,667.40.
With regards to pain and suffering, the uncontroverted testimony of Gust, her daughter, Lauren Whitaker and her sister, Faye McQuillan was that she suffered excruciating pain and discomfort following the blepharoplasty and the subsequent surgeries.
Thus, given the preponderance of the testimony and evidence adduced at trial, we award the following damages:
PAST LOST WAGES: $ 39,750.31
PAST MEDICAL EXPENSES: 70,858.47
FUTURE MEDICAL EXPENSES: 25,000.00
PAST PAIN AND SUFFERING: 70,000.00
FUTURE PAIN AND SUFFERING: 25,000.00
TOTAL: $230,608.78
For the foregoing reasons, the judgment of the trial court is reversed as it relates to plaintiffs injuries. Judgment is rendered in favor of plaintiff awarding her $230,-608.78. In all other respects, the judgment of the trial court is affirmed.
REVERSED AND RENDERED.

. The medical terms which we define in this opinion are based on our review of the testimony of the various medical witnesses in this case. We also referred to Taber's Cyclopedic Medical Dictionary, 14th Edition (1977).
*1013 BLEPHAROPLASTY — a procedure to remove excess skin from the eyelids and herniated orbital fat in pouches and bags.

. CARUNCLE — curved fleshy tissue in the nasal corner of the eye.

. ECTROPION — an outturning or rolling down of the eyelids.

. GRA VES DISEASE —A disorder of the thyroid characterized by exophthalmos.

. EXOPHTHALMOS — the degree of protrusion of the eyeball.

. LAGOPHTHALMOS — inability to close the eyes fully. The distance between the lids when the eye is closed.

. DECOMPRESSION — a surgical procedure designed to cause the eyeballs to move back into the head thus reducing the amount of exo-phthalmos thus allowing the patient to fully close their eyes.

. SCLERAL GRAFTS — a procedure to lengthen or stretch the white outer coat of the eye.

. The defense stipulated that the testimony of Gust's co-workers, Leo Price, James Compora and Gloria Stokes would corroborate Gust’s testimony concerning the symptoms and complaints she experienced both before and after the blepharoplasty.

. CONJUNCTIVITIS —swelling of the mucous membranes of the eyelids.

. SCLERAL SHOW — a condition wherein the white part of the eye shows when the patient's lids are closed such as during sleep.

. LID LAG — lagging of the upper lid behind the eyeball when the patient looks downward.

. Dr. Wolfley did not testify during trial. His deposition was taken by order of the court on June 22, 1989 and by agreement of the parties was made part of the record.

. Upon retirement, Gust would have received a pension of $132.60 per month for life based on her then current salary. However, upon discharge, Gust withdrew her contributions from the retirement system.